**E-Filed 5/5/06**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VIGNERON PARTNERS, LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>WOOP WOOP WINES PTY LTD, et al.,<br><br>　　　　　　　Defendants. | Case Number C 06-00527 JF<br><br>ORDER[1] GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION<br><br>[re: docket no. 15] |

　　　On March 27, 2006, Plaintiff Vigneron Partners, LLC, which does business as Robert Biale Vineyards ("Biale"), filed an application for a temporary restraining order and a motion for a preliminary injunction. Biale seeks to enjoin Defendants Woop Woop Wines Pty Ltd ("Woop Woop") and Epicurean Wines, LLC ("Epicurean") from "importing, selling, offering for sale, advertising or shipping any wine or sparkling wine using the mark THE BLACK CHOOK." On March 31, 2006, the Court issued an order denying the application for a temporary restraining order. On April 28, 2006, the Court heard oral argument on the motion for a preliminary injunction. For the reasons set forth below, the motion will be granted in part.

---

　　　[1] This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

Biale, located in the Napa Valley, owns the registered mark "Black Chicken." Based on an application filed on May 19, 2003, the registration was issued on April 20, 2004. Declaration of J. Scott Gerien in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("First Gerien Decl."), ¶ 2, Ex. 1. Aldo Biale, whose family began growing grapes in the Napa Valley in the 1930s, has explained the origin of the name "Black Chicken." Declaration of Aldo Biale in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction. The name is used because when the Biale family first started selling wine in addition to eggs and produce during the post-World War II era, the family's vineyard was not a government-sanctioned winery. *Id*. Because orders were taken over a party line and thus could be overheard, customers used the code term "black chicken" when ordering wine. *Id*.

When Biale formed a partnership and began producing wine for sale in the 1990s, it used the name "Black Chicken" for some of its wine. Declaration of David Pramuk in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Pramuk Decl."), ¶ 3. The first vintage of Black Chicken wine was produced in 1999 and released in 2001. *Id*. Biale's production has increased over the years — from 400 cases for the 1999 vintage to 1,993 cases for the current vintage of 2004. *Id*. Black Chicken wine now accounts for a third of Biale's total sales. *Id*.

Biale has presented evidence that Black Chicken wine has received praise in the media, has loyal customers, and has been awarded several notable prizes. It has received high marks from the *The Wine Advocate* and favorable reviews from *The Wine Spectator. Id*., Exs. 2, 3. In 2005, Black Chicken wine was named one of the "Best Wines Over $20" by Food & Wine. *Id*., Ex. 4. Biale spends "very little money" on advertising Black Chicken wine, and instead relies on these favorable reviews and recommendations to potential customers by friends and wine professionals. *Id*., ¶ 7. Biale has "received over 800 letters from consumers which demonstrate that 'word of mouth' recognition of our brand drives sales." *Id*.

Woop Woop, located in McLaren Vale, Australia, was established in 2002 to produce

affordable wine to be sold in the United States. Declaration of Tony Parkinson in Support of Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order ("Parkinson Decl."), ¶ 2. Woop Woop—which means "in the middle of nowhere" in Australian slang—has a farm as its principal place of business. *Id.*, ¶¶ 3, 4. There a one-hundred year-old "chook house" on the farm – "chook" is the Australian term for chicken. *Id.*, ¶ 4. Woop Woop's first wine, which it imports to the United States, is named "Woop Woop." *Id.*, ¶ 5. Tony Parkinson ("Parkinson"), who is primarily responsible for the marketing of Woop Woop wines, has stated that Woop Woop chose the name "The Black Chook" for its second wine because Woop Woop "had them on the property, [and] also the association of a black chook and a white egg also expressed the blending of Red Shiraz (black coloured) grapes and white Viognier grapes." Parkinson Decl., ¶¶ 1, 6. Parkinson stated that when Woop Woop applied for a trademark registration in the United States, in October, 2003, it was not aware of Black Chicken wine. *Id.*, ¶ 7.

Epicurean, the importer of Woop Woop wines into the United States, began importing wine with The Black Chook label in 2004. Declaration of Benjamin Hammerschlag in Support of Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order ("Hammerschlag Decl."), ¶ 4. Woop Woop applied for a federal trademark registration for "The Black Chook" in October, 2003, and initially was refused. Parkinson Decl., ¶ 7; First Gerien Decl., Exs. 7-10, 7-11. It ultimately received the registration on July 12, 2005. Parkinson Decl., ¶ 7. The label for The Black Chook wine, which appears not to have been submitted to the United States Patent and Trademark Office ("USPTO"), includes a prominent picture of a black chicken. Declaration of William Fisher in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Fisher Decl."), Ex. 19.

When Biale first learned of The Black Chook wine in the summer of 2005, it sent a letter to Woop Woop's counsel expressing its concerns about the similar labels. Pramuk Decl., ¶ 10. Biale did not receive a response. *Id.* Subsequently, Biale sought more information regarding the sale of The Black Chook wine in the United States, and discovered that the 2004 vintage had been distributed "across a large part" of the United States and thus believed that the 2005 vintage

3

likely would be as well. *Id.*, ¶ 11. On January 27, 2006, Biale filed the complaint in the instant action. Biale and Defendants engaged in settlement negotiations, which came to an impasse on March 24, 2006. First Gerian Decl., ¶ 15.

## II. LEGAL STANDARD

A party seeking a preliminary injunction must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *Mattel, Inc. v. Greiner and Hausser GmbH,* 354 F.3d 857, 869 (9th Cir. 2003). These formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998). A showing of likely success on the merits gives rise to a presumption of irreparable harm in trademark cases. *International Jenson, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

## III. DISCUSSION

**A.   Likelihood of Success on the Merits**

To prevail on a trademark infringement claim, a plaintiff must establish that the defendant "is using a mark confusingly similar its own." *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). As such, a plaintiff seeking a preliminary injunction "must establish that it is likely to be able to show . . . a likelihood of confusion." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053 n.15 (9th Cir. 1999) (citing *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985)). In the Ninth Circuit, the district court is guided by eight factors, often referred to as the *Sleekcraft* factors, in evaluating the likelihood of confusion: (1) similarity of the conflicting designations; (2) relatedness or proximity of the two companies' products or services; (3) strength of the plaintiff's mark; (4) marketing channels used; (5) degree of care likely to be exercised by purchasers in selecting goods; (6) the alleged infringer's intent in selecting its mark; (7) evidence of actual confusion; (8) and likelihood of expansion in product lines. *Sleekcraft*, 599 F.2d at 348-49. There may be

other considerations, and the order of importance of the *Sleekcraft* factors may vary depending on the context of a particular case. *Brookfield*, 174 F.3d at 1054.

As explained in detail below, the Court concludes that, considering the use of the image of a black chicken on The Black Chook labels, each of the *Sleekcraft* factors strongly favors Biale, favors Biale, or is of relative unimportance to the present analysis. Accordingly, as the wine is presently labeled, there is a likelihood of confusion between the parties' marks, and some form of injunctive relief is appropriate.

      1. *Similarity of the Conflicting Designations*

The first factor, the degree to which the marks are similar, "has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). The Court's comparison of the marks "must focus on how each of the marks are perceived by the ordinary consumer in the marketplace, taking into account similarities in the marks' appearance and pronunciation as well as their respective definitions." *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, 2005 WL 701599, *5 (N.D. Cal. 2005). In this comparison, "similarities weighed more heavily than differences." *Brookfield*, 174 F.3d at 1054 (9th Cir. 1999). "The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar with the one party's mark, is presented with the other party's goods alone." *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 466 (N.D. Cal. 1991).

Defendants point out, in great detail, the dissimilarities between the two marks. First, they argue there are several phonetic and visual differences between "Black Chicken" and "The Black Chook" – including the use of the article "the," and the different sound and appearance of "chicken" and "chook." However, the Court is persuaded by Biale's arguments that "chicken" and "chook" are somewhat similar in sound and appearance, and that the use of "the" is of little significance, *see In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997) (observing that the "dominant portion" of "The Delta Cafe" is "Delta").

Second, Defendants highlight the visual and text dissimilarities between the two labels. *See* Fisher Decl., Ex. 19. The "Black Chicken" label has a black background with an image of a grape vine and the mark "Black Chicken" written in small white font. In contrast, the label used for "The Black Chook" has a white background, a large image of a black chicken, and bold black font. The text on the two labels is also different—identifying the different geographic origins of the wines, the different grape varieties, and the different vineyards.

Third, Defendants argue that the meaning of "chook" would not be obvious to consumers. They suggest that, when viewed in connection with the image of the large black chicken, that consumers might "take the graphic to represent any number of things, including 'bird', 'fowl', 'rooster', 'cock', or 'hen.'" Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, p. 12. However, it appears to the Court that the image is distinctly that of a black *chicken*. Fischer Decl., Ex. 19. In addition, the back label states: "What friends, is a chook? It's Australian for chicken." *Id*.

The degree to which the marks are similar turns significantly on the use of the chicken image on the label, which increases significantly the likelihood that consumers will infer the meaning of "chook" and confuse the parties' marks. Accordingly, at least with the current label, this factor tips in favor of Biale.

2.  *Relatedness or Proximity of Products or Services*

If products or services are "sufficiently 'complementary' or 'related,'" then "the public is likely to be confused as to the source of the services." *American Intern. Group, Inc. v. American Intern. Bank*, 926 F.2d 829, 832 (9th Cir. 1991). In *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1082 (9th Cir. 2005), the Ninth Circuit upheld the district court's finding that the proximity of goods factor weighed in one party's favor, "but *only slightly* because the genres of the music CDs are very significantly different" (emphasis added). In *E. & J. Gallo Winery*, the court found that the wine produced by Gallo Nero, a trade association whose members produce Chianti wine (a variety of red wine), and the wine produced by E. & J. Gallo Winery (including red wine), the largest winery in the United States, were "substantially similar for purposes of

establishing a likelihood of confusion." *E. & J. Gallo Winery*, 782 F.Supp. at 459-60, 463. However, in a similar case involving wine trademarks, the District Court for the Eastern District of New York concluded that the wines at issue "differ in ways that may be deemed material to consumers:"

> First, Banfi's COL-DI-SASSO is a 50-50 blend of Sangiovese and Cabernet. On the other hand, ROBERT PEPI COLLINE DI SASSI is both labeled and marketed solely as a Sangiovese, even though it contains a small percentage of Cabernet. Additionally, COL-DI-SASSO is marketed as an affordable, everyday red wine, and as such is sold to distributors, who in turn market the wine to discount drug stores, supermarkets, and mid-range Italian restaurant chains. ROBERT PEPI COLLINE DI SASSI, marketed as a high-end, special occasion wine, is sold exclusively in fine restaurants and retail wine stores. In fact, Kendall-Jackson submitted no evidence to suggest that the two wines at issue were ever sold in the same location, be it restaurant or retail store.
> Additionally, Banfi's COL-DI-SASSO is sold for $8 to $10 per bottle in stores, and $16 to $23 per bottle in restaurants. Conversely, ROBERT PEPI COLLINE DI SASSI is sold for double this price, i.e., $20 to $25 in stores, and $35 to $45 in restaurants. Banfi's wine is often sold by the glass in restaurants as a promotional tool, whereas Kendall-Jackson's is rarely, if ever, sold by the glass.

*Banfi Products Corp. v. Kendall-Jackson Winery, Ltd.*, 74 F.Supp.2d 188, 197 (E.D.N.Y. 1999)

Defendants argue that, although the products are related, they are not in close proximity. They have submitted a newspaper article in which Zinfandel wine is described as a "cult wine," and David Pramuk, a partner in Vigneron Partners, is quoted as saying "'Zinfandel has developed a following of real wine drinkers, not collectors." Fisher Decl., Ex. 2; Pramuk Decl., ¶ 1. They also argue that the different grape varieties used in producing the wines and the different prices of the wines make the products appreciably distinct. However, while there are some differences between the two wines, the Court is persuaded by Biale's argument that it is common practice for the same brand to be used for different wine varieties sold at different prices. Second Gerien Decl., Exs. 4-12. Accordingly, this factor weighs at least somewhat in Biale's favor.

### 3. *Strength of the Plaintiff's Mark*

A mark is considered to be stronger, and therefore accorded greater protection, when it is more likely that the mark will "be remembered and associated in the public mind with the mark's owner." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). "This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial

strength." *Id*. The conceptual strength—distinctiveness—of a mark is determined by the "imagination test" and the "need test." *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1221 n.4 (9th Cir. 2003). With the "imagination test," the Court "'asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies . . . [t]he more imagination required, the stronger the mark is.'" *Id* (quoting *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988). With the "need test," the Court "'asks to what extent a mark is actually needed by competitors to identify their goods or services.'" *Id*. The commercial strength of a mark may be "acquire[d] . . . through use in commerce." *Sutter Home Winery*, 2005 WL 701599 at *9.

Defendants have not contested the strength of the "Black Chicken" mark. This omission is consistent with the Court's observation that "Black Chicken" is an arbitrary mark, requiring a significant degree of imagination to associate it with wine, and that distinctive labeling is required to identify wine. Accordingly, this factor weighs in favor of Biale.

    4.  *Marketing Channels Used*

Likelihood of confusion is increased by "[c]onvergent marketing channels," *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993), including "similarity in advertising," *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). In *E. & J. Gallo Winery*, the court found "as a matter of law that both parties use similar marketing channels to distribute their wines" because "[b]oth parties market their products through retail establishments like wine shops and liquor stores, and utilize magazines for advertizing purposes." *E. & J. Gallo Winery*, 782 F.Supp. at 464. The court further based this conclusion on evidence that both parties use a store in Washington, D.C. and its "finding that the wines are marketed by similar means." *Id*.

    Defendants point out several differences between the parties' marketing channels. While Biale spends about forty percent of its "time, effort and expense" on direct sale marketing, Fisher Decl. Ex. 11, "Woop Woop distributes The Black Chook wine in the United States solely through its exclusive importer, Epicurean Wines," Parkinson Decl., ¶ 10. However, while there

are some differences in marketing channels, there are also significant similarities. Importantly, both parties' wines are sold in retail stores and restaurants. Hammerschlag Decl., ¶ 5; Pramuk Decl., ¶ 8. Accordingly, this factor tips in favor of Biale.

5. *Degree of Care Likely to be Exercised by Purchasers in Selecting Goods*

The standard used to assess the likelihood of confusion to the public "is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. Although this standard may exclude the "wholly indifferent," it "includes the ignorant and the credulous." *Id*. It is "assumed that sophisticated consumers and buyers of expensive goods will exercise greater care in their purchases, thereby reducing the likelihood of confusion or mistake as to the origin of the goods." *Sutter Home Winery, Inc.*, 2005 WL 701599, at *11. Conversely, it is more likely that consumers will be confused by two marks "where the goods at issue involve relatively inexpensive, 'impulse' products to which the average, 'unsophisticated' consumer does not devote a great deal of care and consideration in purchasing." *E. & J. Gallo Winery*, 782 F.Supp. at 465.

In *E. & J. Gallo Winery*, a case decided in 1991, the court found that "lack of consumer sophistication significantly enhance[d] the likelihood of confusion" between Gallo Nero wine and Gallo wine. *Id*. That court based its conclusion in part on *Taylor Wine Co.*, in which the Second Circuit found in 1978 that

> [w]ine is a product whose quality is accepted by many simply on faith in the maker. They can perhaps identify the vintner better than the wine. It is doubtless true that some wartime soldiers did bring back from Europe an inchoate taste for wine and for some of its nuances, and that other Americans have acquired a similar taste. Yet, the average American who drinks wine on occasion can hardly pass for a connoisseur of wines. He remains an easy mark for an infringer.

*Id*.; *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 733-34 (2d Cir. 1978). The *E. & J. Gallo Winery* court founded "Gallo Nero has failed to contest either through evidence or legal support the characterization of the wine-buying public as generally unsophisticated 'impulse' buyers who are an 'easy mark for a [trademark] infringer.'" *E. & J. Gallo Winery*, 782 F.Supp. at 465.

Defendants argue that the wine-buying public has become significantly more

sophisticated in the years since in the years since *Taylor Wine Co., Inc.* and *E. & J. Gallo Winery* were decided. Defendants have submitted reports showing that the percentage of alcohol consumers who prefer wine over liquor or beer increased from 22% in 1990 to 33% in 2004, and is at 39% in 2006. Fisher Decl., Ex. 14 , p. 477 (*The U.S. Wine Market: Impact Databank review and Forecast* (2005 ed.)), Ex. 15 (Lydia Saad, *Wine Gains Momentum as Americans' Favorite Adult Beverage*, Gallop Poll News Service, July 18, 2005). In 2004, approximately 45% of domestic dinner/table wine drinkers had household incomes of $75,000 or more and approximately 57% were 45 years old or older. Fisher Decl., Ex. 14, p. 487.

Both parties have submitted declarations from people working in the wine industry who have offered their opinions on wine consumers and the likelihood of confusion between Black Chicken wine and The Black Chook wine. Michael Teer, the owner of a retail wine shop in Seattle, Washington, has stated that "wine consumers are more knowledge [sic] today than they were ten or fifteen years ago." Declaration of Michael Teer, ¶¶ 1, 6. John Ritmaster, the owner of a wine shop and restaurant in Walnut Creek, has stated: "Our customers are fairly savvy and, by and large, are aware of wine trends. They understand regionality and would not mistake an Australian wine for a California Zinfandel. They also differentiate on price." Declaration of John Ritmaster, ¶¶ 2, 10.

However, Bert George, the owner of a retail wine business in San Jose, California, has stated: "I cannot think of any other consumer product with more brands available than wine. Because of this, the average consumer will not remember small distinctions between labels for all of these different brands. It is also quite common for many different varietals of wine to be sold under the same brand name at different price points from less expensive, to more expensive. . . . Because of this, consumers are not likely to distinguish between similar brands based on the varietal of the wine or the price at which it is sold. Consumers distinguish between brands based on the brand name." Declaration of Bert George in Support of Motion for Preliminary Injunction, ¶¶ 1, 2, 6. Also, Paul Einbund, a sommelier, has stated: "While some of the people who come to our restaurant are knowledgeable about wine, wine brands and the meaning of vintage, vineyard and geographic origin, the large majority of people I interact with are not. This

is not surprising as there are over 1,400 different wine labels from California alone and it is sometimes difficult even for me to properly distinguish between all of them." Declaration of Paul Einbund in Support of Motion for Preliminary Injunction, ¶¶ 1, 4. Biale has also submitted evidence showing that the Alcohol and Tobacco Tax and Trade Bureau issued 73,256 certificates of label approval for wine in 2005 and USPTO received 3,113 trademark applications for wine in 2005. Declaration of J. Scott Gerien in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Second Gerien Decl."), ¶¶ 2, 3, Exs. 1, 2.

Biale argues also that the relatively low price of the wines—"Black Chicken" wine generally is sold at retail at $35 per bottle, and "The Black Chook" is sold at approximately $16 to $17—makes these wines "impulse" products. Pramuk Decl., ¶ 7; Hammerschlag Decl., ¶ 7. N In a recent case involving champagne and sparking wine, the Federal Circuit observed that:

> champagne and sparkling wines are not necessarily expensive goods which are always purchased by sophisticated purchasers who exercise a great deal of care in making their purchases. . . . Although some champagne can be expensive, many brands sell for around $25 a bottle, and sparkling wines for less than $10 a bottle. Moreover, general consumers, not just connoisseurs, occasionally purchase champagne or sparkling wines on celebratory occasions, with little care or prior knowledge. And even more sophisticated purchasers might be aware that champagne houses offer both types of products under similar marks, and could easily conclude that VEUVE ROYALE was Veuve Clicquot's sparkling wine.

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1376 (Fed. Cir. 2005).

Based on the record presently before the Court, It is difficult to generalize as to the degree of care consumers of wine are likely to take in making their wine selections. There is support for the conclusion that many wine consumers, especially those "fairly savvy" wine consumers who are more likely to purchase Biale's Black Chicken wine, are not easily confused by the distinctions between wine varieties and brands. However, because the standard "includes the ignorant and the credulous," *Sleekcraft*, 599 F.2d at 353, it must include the portion of wine consumers who are not especially savvy. There is also support, from previous case law and the evidence presented, that consumers may treat wine priced between $16 and $35 as an "impulse" product. Accordingly, on the evidence presently before the Court, this factor tips somewhat in favor of Biale.

11
Case No. C 06-00527 JF
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(JFLC1)

      6. *Alleged Infringer's Intent in Selecting its Mark*

A court presumes "that the public will be deceived" if "the alleged infringer knowingly adopts a mark similar to another's." *Sleekcraft*, 599 F.2d at 354. Evidence of a defendant's intent to confuse is probative of likely confusion because "[c]ourts assume that the defendant's intentions were carried out successfully." *Playboy Enter., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). Conversely, "while good faith 'may be given considerable weight in fashioning a remedy,' it is only marginally probative of absence of consumer confusion." *Sutter Home Winery, Inc.*, 2005 WL 701599 at *12 (citing *Sleekcraft*, 599 F.2d at 354; *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir. 1980)).

Biale argues that Woop Woop's ignorance of the "Black Chicken" mark prior to its filing with the USPTO in October, 2003 was *willful* ignorance. Biale observes that if Woop Woop had conducted a trademark search of the USPTO database, it would have discovered that Biale had submitted its application for the "Black Chicken" mark on April 19, 2003. First Gerien Decl., Ex. 1. Without considering whether Woop Woop was willfully ignorant of the "Black Chicken" mark, it is evident that Woop Woop must have learned of the "Black Chicken" mark by April, 2004, when the USPTO initially refused to register the mark for "The Black Chook" because, considering the "Black Chicken" mark, it was considered by the examining attorney "to be likely to cause confusion, to cause mistake, or to deceive." *Id*., Exs. 7-10, 7-11. In response to the examining attorney's conclusions, Woop Woop's counsel stated: "It is believed that if the term were used in the United States, only those persons who were from Australia, or those who may have been in Australia and had heard the word 'chook' would know its meaning. . . . the average person in the United States would not know of a relationship between 'The Black Chicken' and 'The Black Chook.'" *Id*., Ex. 7-4. There is no evidence that Woop Woop submitted a copy of the label for "The Black Chook" wine to the USPTO. Woop Woop received the registration on July 12, 2005. Parkinson Decl., ¶ 7.

Despite having the trademark registration application for "The Black Chook" refused, Defendants began importing and selling "The Black Chook" wine in June, 2004. Hammerschlag Decl., ¶ 4. "Adopting a designation with knowledge of its trademark status permits a

12

Case No. C 06-00527 JF
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(JFLC1)

presumption of intent to deceive." *Interstellar Starship Services, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999)  And, "[i]n turn, intent to deceive is strong evidence of a likelihood of confusion." *Id*.  The only evidence indicating that Defendants did not act in bad faith are declarations.  Parkinson stated that Woop Woop "did not select the name 'The Black Chook' in bad faith or with any intent to infringe or trade off of the reputation or goodwill of Plaintiff's mark 'Black Chicken'; we did not even know about it at the time.  Woop Woop Wines did not become aware of Plaintiff, or its mark 'Black Chicken' until the trademark examiner brought it to our attention." Parkinson Decl., ¶ 8.  Benjamin Hammerschlag, the owner of Epicurean, stated similarly that he "was not aware of Vigneron Partners, Robert Biale Vineyards, or their Black Chicken wine or trademark, and Epicurean Wines has never used the name 'The Black Chook' in bad faith or with any intent to infringe or trade off of the reputation or goodwill of Plaintiff's mark BLACK CHICKEN.  In any event, we do not believe our use of Woop Woop Wines' registered trademark is likely to cause any confusion or association with Plaintiff or its Black Chicken wine." Hammerschlag Decl., ¶ 14.

   This factor weighs strongly in support of Biale's position.  While there is no evidence that Defendants initially chose the mark in bad faith, the evidence of Defendants' later conduct strongly supports a finding of bad faith.  Defendants proceeded to sell wine in the United States after they had been put on notice of the possible consumer confusion between the marks, and before Woop Woop's "The Black Chook" mark was registered.  Moreover, Woop Woop's representation to the USPTO that "the average person in the United States would not know of a relationship between 'The Black Chicken' and 'The Black Chook'" is disingenuous considering that the label, which was not provided to the USPTO, showed a prominent picture of a black chicken.

   7. *Evidence of Actual Confusion*

   Evidence of actual confusion can be highly probative: "If enough people have been actually confused, then a likelihood that people are confused is established." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).  However, "evidence of actual confusion

will [not] always compel a jury to find likelihood of confusion. In some cases, a jury may properly find actual confusion evidence de minimis and thus 'unpersuasive as to the ultimate issue. . . .'" *Id*. (internal quotations and citations omitted).

When Biale filed its motion, it did not present any evidence of actual consumer confusion. Accordingly, Woop Woop has premised its arguments on the initial circumstance in which there was no evidence of actual confusion. However, in the intervening time, Biale has learned of actual confusion. On April 10, 2006, Amanda Ramos-Rodriguez ("Ramos-Rodriguez") went to a wine tasting in Orlando, Florada, where several Biale wines were sampled. Declaration of Amanda Ramos-Rodriguez ("Ramos-Rodriguez Decl."), ¶ 2. Ramos-Rodriguez has stated that when the Biale representative said that the name of the Zinfandel was "Black Chicken," she responded "You mean the Black Chook?" *Id*. ¶ 3. Ramos-Rodriguez explained to the representative "that I was previously a manager for a chocolatier and that I had bought The Black Chook a few months before for a wine tasting that I paired with chocolate for the store. I explained that when he said The Black Chicken I thought he was talking about that particular wine I had previously promoted for the tasting." *Id*.

Additionally, Biale has submitted a copy of an e-mail inquiry to Biale's website with the message "Mailing list & black chook society." Declaration of Al Perry in Support of Motion for Preliminary Injunction, Ex. 1. As Biale itself notes, this e-mail is of little probative value because the message does not indicate clearly that the sender is confusing Black Chicken wine with The Black Chook wine. However, it does suggest that consumers may associate either the wines or the words, "chook" and "chicken."

Biale's anecdotal evidence of actual confusion provides some support for concluding that there is a likelihood of confusion. However, because there is only minimal evidence of actual confusion, it is not highly probative.

8. *Likelihood of Expansion in Product Lines*

"A strong likelihood that either party may expand his business to compete with the other favors a finding of infringement." *Official Airline Guides, Inc.*, 6 F.3d at 1394. However, when

parties "already sell directly competing products," this factor does not weigh in either party's favor. *Sutter Home Winery, Inc.*, 2005 WL 701599 at *13. Biale argues that this factor is not relevant because the parties' wines already are in direct competition. Defendants focus on the differences between the wine varieties, noting that Biale has produced no evidence indicating that it plans to produce the particular wines that are sold with "The Black Chook" label (Shiraz Viognier and Sparkling Shiraz). Parkinson Decl., ¶¶ 6, 9. Having concluded that, while there are some differences between the parties wines, these wines presently are in relatively close proximity in the market, this factor is not highly relevant to the Court's present analysis.

**B.   Presumption of Irreparable Injury**

Biale argues that if the Court finds that Biale is likely to succeed on the merits, it must presume irreparable injury:

> [O]nce a trademark owner has shown a likelihood of success on the merits, the resultant loss of control over the trademark and a loss of goodwill associated therewith by the owner of the mark is irreparable injury sufficient to support a preliminary injunction. In other words, there is always irreparable injury when trademark infringement exists. Further, harm is presumed to be irreparable because of the substantial likelihood of public deception and confusion.

*Dep Corp. v. Opti-Ray, Inc.*, 768 F. Supp. 710, 717 (C.D.Cal. 1991). Relying on *Sardi's Restaurant Corp.*, 755 F.2d 719, Defendants contend that this presumption is not absolute. In *Sardi's*, the Ninth Circuit reviewed a district court's denial of a motion for preliminary injunction. *Id*. Because the district court had not determined the likelihood of confusion, the Ninth Circuit considered the likelihood of confusion in conjunction with the possibility of irreparable harm. *Id*. at 724. Thus, the Ninth Circuit's consideration of additional factors was motivated by its analysis of the likelihood of confusion, not by any additional requirement that would be necessary in order to apply the presumption of irreparable injury. Accordingly, having found that Bialy is likely to succeed on the merits in establishing a likelihood of confusion as "The Black Chook" wine is presently labeled, the Court presumes irreparable injury.

### C. Injunctive Relief

Having weighed all of the arguments and evidence presented by the parties, the Court concludes that some form of injunctive relief is warranted. However, the specific relief requested by Biale—that Defendants be enjoined from using the mark "The Black Chook"—is overly broad. The Court's conclusion that there is a likelihood of confusion is based in large part on the association between "chook" and "chicken" resulting from the use of the image of a black chicken on Woop Woop's label. While it is possible that the use of the mark "The Black Chook" is itself a trademark violation, the Court need not reach that question at the present time. Accordingly, the Court will enjoin Defendants from importing, selling, offering for sale, advertising or shipping any wine or sparking wine in the United States that bears a label with the mark "The Black Chook" in conjunction with any image representing a chicken or identifiable as a part of a chicken. Defendants will be prohibited from using such an image on either the front or back label. Additionally, Defendants will be prohibited from providing an explanation that "chook" is a slang term for "chicken" in Australia. The new labels will be subject to approval of the Court.

Defendants also will be required to design, produce, and send stickers to the independent distributors of The Black Chook wine. These stickers shall state "This wine is no way associated with and should not be confused with Black Chicken wine produced by Robert Biale Vineyards." Defendants shall request that the independent distributors affix a sticker on the front of each bottle of The Black Chook wine, immediately below the label. The sticker and the letter that Defendants will send to the independent distributors will be subject to approval of the Court.

### D. Determination of the Appropriate Bond

The Court expects that there will be minimal prejudice to Defendants as the result of this order, with the main effect being the cost of designing, manufacturing, affixing new labels and creating and distributing stickers for use by the Defendants' independent distributors. Consequently, Defendants will be requested to post a bond of $30,000. The amount of the bond is subject to modification upon a showing by any party that a different amount is warranted.

### III. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that pending the trial of this action or until otherwise ordered by the Court, Defendants are enjoined and restrained from importing, selling, offering for sale, advertising or shipping any wine or sparking wine in the United States that bears a label with the mark "The Black Chook" in conjunction with any image representing a chicken or identifiable as a part of a chicken. Defendants are prohibited from using such an image on either the front or back label. Defendants are also prohibited from providing an explanation that "chook" is a slang term for "chicken" in Australia.

Additionally,

(a) Defendants shall design, produce, and send stickers to all independent distributors of The Black Chook wine. These stickers shall state "This wine is no way associated with and should not be confused with Black Chicken wine produced by Robert Biale Vineyards." Defendants shall request that the independent distributors affix a sticker on the front of each bottle of The Black Chook wine, immediately below the label.

(b) Defendants shall submit proposed front and back labels, a proposed sticker, and a proposed letter to the independent distributors not later than Friday, May 12, 2006. Biale shall submit any comments with respect to Defendants' proposals not later than three business days after Defendants' submission to the Court.

(c) This Order shall be effective upon the posting of a bond in the amount of $30,000.

DATED: May 5, 2006

_____
JEREMY FOGEL
United States District Judge

Case No. C 06-00527 JF
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(JFLC1)

1  This Order has been served upon the following persons:

2  David Balter              dbalter@dpfnapa.com

3  Paul P. DeAngelis         pdeangelis@pwmlaw.com,

4  William David Fisher      wfisher@schwabe.com, ttafoya@schwabe.com; docket@schwabe.com

5

6  J. Scott Gerien           sgerien@dpfnapa.com

7  Jennifer L Jolley         jjolley@schwabe.com, ttafoya@schwabe.com; docket@schwabe.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-00527 JF
ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(JFLC1)